UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARYAM TILLMAN, o/b/o M.K.,

                                   Plaintiff,

                    v.

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 17, 2014
```

13 Civ. 5053 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Maryam Tillman, proceeding *pro se*, filed this action on behalf of her minor daughter (referred to as "M.K."), pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision of the Acting Commissioner of Social Security (the "Commissioner") that denied Plaintiff's application for Supplemental Security Income ("SSI") benefits for M.K. based on a finding that M.K. was not disabled under the Act.[1]  Defendant has moved, unopposed, for judgment on the pleadings requesting that the Commissioner's decision be upheld.  Because the Commissioner's decision is supported by substantial evidence, Defendant's motion is granted.

---

[1]    The *pro se* Complaint in this action contained the full name of the minor on whose behalf it is brought.  As required by Fed. R. Civ. Pro. 5.2(a), the Court has substituted M.K.'s initials for her full name.

BACKGROUND[2]

## A.    M.K.'s Medical Evaluations

M.K. was 11 years old when she was injured in a car accident on December 8, 2008.  (SSA Rec. 198).  After the accident, M.K. was taken to the hospital, where she was diagnosed with left shoulder pain and discharged the same day.  (*Id.* at 200-03).

M.K. was evaluated by Dr. Marvin Moy four days later, on December 12, 2008.  (SSA Rec. 377-86).  During the visit, M.K. complained of neck pain that radiated to her left shoulder.  (*Id.* at 377).  She also reported difficulty sleeping due to that pain, for which she took Ibuprofen.  (*Id.* at 379-80).  During a physical examination, the doctor observed a limited range of motion of M.K.'s left shoulder and a mildly restricted range of motion of M.K's cervical spine. (*Id.* at 381).[3]

A magnetic resonance imaging test ("MRI") of M.K.'s cervical spine, dated December 16, 2008, showed posterior bulging of the intervertebral discs at C3-C4, C4-C5, and C5-C6, which caused "impingement of the anterior thecal space" and "reversal of the cervical curve."  (SSA Rec. 260-61).  An MRI of the left shoulder, dated December 29, 2008, was normal.  (*Id.* at 259).

---

[2]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #18) filed by the Commissioner as part of her answer.  For convenience, Defendant's supporting memorandum is referred to as "Def. Br."  (Dkt. #20).  No other documents were filed in support of, or in opposition to Defendant's motion.

[3]    The cervical spine is the upper "part of the spine that runs through the neck area." Cervical MRI Scan, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/007354.htm (last visited Dec. 17, 2014).

M.K. returned to Dr. Moy on January 10, 2009, with complaints of lumbar spine pain and cervical spine pain.  (SSA Rec. 375).  Dr. Moy noted paraspinal tenderness, and a slight improvement in M.K.'s pain since her last visit.  (*Id.* at 376).  M.K. returned to Dr. Moy on February 19, 2009, and Dr. Moy again assessed cervical and lumbar spine pain.  (*See id.* at 373-74).

Plaintiff was examined at Montefiore Medical Center ("Montefiore") in the Bronx, New York, on February 17, 2009.  (SSA Rec. 306).  M.K. complained of fatigue, neck pain, left shoulder pain, headaches, and leg pain, but reported that the pain resolved with Tylenol and that she was able to run "well" and sleep "alright."  (*See id.*).

M.K. had an initial consultation with Dr. Tong Li for neck and shoulder pain on February 25, 2009.  (SSA Rec. 392).  M.K.'s range of motion was found to be full in her cervical spine and both shoulders (*id.* at 393-94), and limited in her lumbosacral spine (*id.* at 395).[4]  Dr. Li diagnosed myofascial pain syndrome,[5] cervical spine strain, left shoulder strain, lumbosacral strain; he also made "rule out" notations regarding cervical radiculopathy and lumbar radiculopathy.  (*Id.*).[6]  Dr. Li noted that M.K.'s neck pain was not

---

[4]   The lumbosacral area is "the lower part of the spine, which includes the lumbar region and the sacrum, the area that connects the spine to the pelvis."  Lumbosacral Spine X-ray, National Institutes of Health, U.S. National Library of Medicine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003807.htm (last visited Dec. 17, 2014).

[5]   "Myofascial pain syndrome is a chronic pain disorder.  In myofascial pain syndrome, pressure on sensitive points in your muscles (trigger points) causes pain in seemingly unrelated parts of your body."  Myofascial Pain Syndrome, Mayo Clinic, Diseases and Conditions, http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195 (last visited Dec. 17, 2014).

[6]   Radiculopathy is "[a] nerve root injury ... sometimes referred to as a 'pinched' nerve."  Cervical Radiculopathy (Pinched Nerve), American Academy of Orthopaedic Surgeons,

responding well to conservative treatment.  (*Id.*).  Accordingly, he referred her for further neurological and pain evaluation, and recommended that she continue receiving chiropractic treatment and any pain medication prescribed by her referring physician.  (*Id.*).

M.K. attended follow-up appointments with Dr. Moy on March 26, 2009, April 20, 2009, and June 16, 2009.  (SSA Rec. 367-72).  During this time, M.K.'s lower back and neck pain improved, but she still complained of some neck pain.  (*See id.* at 367, 371).

Plaintiff returned to Montefiore on October 15, 2009.  (SSA Rec. 305).  M.K. reported doing well in school, but complained of neck, "arm/shoulder," and lower back pain.  (*Id.*).  On physical examination, M.K.'s neck, back, and extremities were all found to be within normal limits.  (*Id.*).

M.K. also received extensive chiropractic treatment from Dominic J. Rubino following the accident.  These chiropractic visits were frequent in late 2008 through 2009, but tapered off during the latter part of 2010.  Specifically, M.K. visited Dr. Rubino on 61 occasions (roughly twice a week) during the seven-month period from December 2008 to June 2009; on 23 occasions

---

OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited Dec. 17, 2014).

Although a "rule out" notation may appear on a patient's chart alongside diagnoses, such a notation does not constitute a diagnosis.  *See Santiago* v. *Colvin*, No. 12 Civ. 7052 (GBD) (FM), 2014 WL 718424, at *13 (S.D.N.Y. Feb. 25, 2014), *report and recommendation adopted*, 2014 WL 1092967 (S.D.N.Y. Mar. 17, 2014); *accord Merancy* v. *Astrue*, No. 10 Civ. 1982 (MRK) (WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012), *report and recommendation adopted*, No. 10 Civ. 1982, Dkt. #28 (D. Conn. May 22, 2012).  The "rule out" notation is used where a doctor has insufficient information to form a diagnosis, but wants to indicate in the patient's file a need to eliminate or exclude a diagnosis from consideration in the future.  *See Santiago*, 2014 WL 718424, at *13.

(roughly twice a month) during the ten-month period from February 2010 to December 2010; and then only four times in 2011, all during the month of December.  (*See* SSA Rec. 332-36, 340-41, 354-56).

M.K. was seen by Dr. Karen Warman, an Associate Professor of Clinical Pediatrics at Albert Einstein College of Medicine, on October 15, 2010.  (SSA Rec. 292, 408).  M.K. complained of neck pain, shoulder pain, headaches, low energy, drowsiness, and lumps on the left side of her neck.  (*Id.* at 292).  M.K. reported that she was doing well with her math tutor and had resource room help for reading comprehension, liked going to the park and beach and eating out, and got along well with others.  (*Id.* at 295).  M.K. also stated that she managed her headaches by taking Tylenol.  (*Id.*).

On December 28, 2010, Dr. Thomas DePaola performed a consultative pediatric examination of M.K. at the request of the Commissioner.  (SSA Rec. 262-67).  M.K. again complained of headaches, neck pain, and shoulder pain, but explained that she was able to attend gym classes by sitting out for a few moments whenever she had discomfort.  (*Id.* at 262-63).  She added that her attendance at school had not been affected, and that she had not been hospitalized for her pain.  (*Id.*).

During the examination with Dr. DePaola, M.K. also reported having a learning disability.  (SSA Rec. 262).  Dr. DePaola noted that M.K. was in general and special education classes, and had no behavior problems.  (*Id.* at 263).  M.K. reported daily activities that included watching television, listening to music, playing with her sibling, doing homework and chores, reading,

coloring, drawing, using the computer, playing with friends, and using Facebook.  (*Id.* at 263).

On examination, Dr. DePaola found no range of motion limitations, full motor strength in the upper and lower extremities (despite some pain with left elbow flexion), and a normal spine.  (SSA Rec. 265-66).  Neurological examination revealed physiologic and symmetrical reflexes in the upper and lower extremities and age-appropriate fine motor activity and grip strength.  (*Id.* at 265).  According to Dr. DePaola, M.K. "has some limitations on physical activity because of her pain, although she only needs to rest for a few seconds when she is taking gym, in the child's own words.  She needs to continue following [up] with healthcare providers as needed and getting her special education as needed."  (*Id.* at 266).

A state agency pediatric medical consultant, Dr. J. Randall, reviewed M.K.'s medical record and completed a Childhood Disability Evaluation on January 5, 2011, which was cosigned by Natalie Tomcho, a speech and language pathology consultant.  (SSA Rec. 268-73).[7]  The consultants found that M.K. had a less than marked limitation in the functional domain of acquiring and using information.  (*Id.* at 270).  The consultants found no limitation in M.K.'s ability to complete tasks, and a less than marked limitation in her ability to interact and relate with others.  (*Id.*).  Dr. Randall considered the MRI that revealed bulging disks in the cervical spine and M.K.'s complaints of pain in the neck and shoulder, but found that M.K. had a less than marked

---

[7]      The record does not indicate Dr. Randall's first name.

limitation in her ability to move about and manipulate objects because she was able to attend gym class at school and because her physical examination findings were consistently normal.  (*Id.* at 271).  Dr. Randall also assessed M.K. as having no limitations in the domain of caring for herself and a less than marked limitation in the domain of health and physical well-being based upon the December 2008 MRIs of the spine and shoulder, as well as the results of Dr. DePaola's examination.  (*Id.*).  As a result of their review, the consultants concluded that M.K.'s "allegations of pain [were] only partially credible," and ultimately opined that M.K. did not functionally meet the criteria for disability under the "Listing of Impairments" provided in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  (*Id.* at 271-72).

M.K. was seen by Dr. Kanwal Farooqi (a pediatric cardiology fellow) in November 2010 and on February 9, 2011, for complaints of chest pain on exertion.  (SSA Rec. 302-03).  Dr. Farooqi noted that the results of her examination, which included an echocardiogram and cardiopulmonary stress test, were normal; she further opined that no restrictions in M.K.'s activities were warranted, including her ability to attend gym at school.  (*Id.*).

M.K. returned to Dr. Rubino on January 5, 2012, who noted some range of motion restrictions in M.K.'s cervical and lumbar spine.  (SSA Rec. 337-38).  Dr. Rubino concluded that M.K.'s limitations were the result of another motor vehicle accident on February 5, 2011.  (*Id.* at 339).  He stated that this "type of trauma to the spine invariably creates muscular and ligamentous instabilities with resultant acute asymmetrical misalignments and nerve irritation."  (*Id.* at

7

339).  Dr. Rubino opined that M.K. had "reached a permanent and stationary

plateau," but that her condition may result in advanced disc degeneration and

spondylosis in the future.  (*Id.*).[8]

M.K. returned to Dr. Warman on February 3, 2012.  (SSA Rec. 286).

Dr. Warman noted that M.K. was in the seventh grade, had an Individualized

Education Program ("IEP") at school, and was a good student.  (*Id.*).[9]  Physical

and neurological examinations were normal, including no deformities and full

range of motion in all joints.  (*Id.* at 288).  During the psychiatric exam Dr.

Warman administered, M.K. was "alert and cooperative, [with a] normal affect,

age-appropriate attention span and level of motor activity."  (*Id.*).  Dr. Warman

assessed stuttering, neck pain, and thalassemia, and prescribed Benadryl,

Tylenol, and Cetirizine.  (*See id.* at 289).[10]

---

[8]     "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal
disks in your neck.  As the disks dehydrate and shrink, bone spurs and other signs of
osteoarthritis develop.  Cervical spondylosis is very common and worsens with age."
Cervical Spondylosis, Mayo Clinic, Diseases and Conditions,
http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition
/con-20027408 (last visited Dec. 16, 2014).

[9]     An IEP is "a written statement that sets out the child's present educational
performance, establishes annual and short-term objectives for improvements in that
performance, and describes the specially designed instruction and services that will
enable the child to meet those objectives."  *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167,
175 (2d Cir. 2012) (internal citation and quotation marks omitted).  School districts are
generally required to create annual IEPs for students who are enrolled in special
education classes.  *See* 20 U.S.C. § 1414(d).

[10]    Thalassemia is a blood disorder passed down through families in which the body makes
an abnormal form of hemoglobin — the protein in red blood cells that carries oxygen.
The disorder results in excessive destruction of red blood cells, which leads to anemia.
*See* Thalassemia, National Institutes of Health, U.S. National Library of Medicine,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000587.htm (last
visited Dec. 16, 2014).

Cetirizine is used to temporarily relieve the symptoms of hay fever (allergy to pollen,
dust, or other substances in the air) and allergy to other substances (such as dust
mites, animal dander, cockroaches, and molds).  *See* Cetirizine, National Institutes of
Health, U.S. National Library of Medicine, MedlinePlus,

**B.    M.K.'s School Evaluations**

M.K.'s school psychologist, Dr. Christiane A. Bandele, evaluated M.K. on May 7, 2008, when she was in the third grade.  (SSA Rec. 224-25).  M.K. had academic delays, but was generally well-behaved.  (*Id.* at 224).  According to Dr. Bandele, M.K. was held back in the first grade, but showed improvement in the second grade.  (*Id.* at 225).  Based on the Wechsler Intelligence Scale for Children, fourth edition, intelligence test ("WISC-IV"), M.K.'s full scale IQ was 84, which represented "low average" to "average" cognitive functioning.  (*Id.*). M.K. obtained the following grade-level scores in academic areas upon administration of the Woodcock-Johnson Test of Academic Achievement, which all were in the average range for students her age: "level 3" in letter-word identification, "level 3.8" in calculation, "level 3.3" in spelling, "level 2.6" in passage comprehension, and "level 2.6" in applied problems.  (*Id.* at 226).[11] Dr. Bandele concluded that M.K. had "a very mild learning disability," with no significant difficulties in M.K.'s social and emotional functioning.  (*Id.* at 226-27).  Finally, Dr. Bandele noted that M.K. "is a bright, creative, and well-behaved child who needs some additional academic support to reach her high potential in school."  (*Id.* at 226).

M.K.'s November 10, 2009 IEP indicated that she was a fifth-grade student who exhibited eagerness and willingness to learn and could remain on

---

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698026.html (last visited Dec. 16, 2014).

[11]    Although M.K.'s grade-level scores were quite close to her actual grade level, Dr. Bandele noted that "her grade equivalent scores should be compared to her chronological age rather than [her] current grade placement given that she was retained in the first grade."  (SSA Rec. 226).

task for a given amount of time but had difficulty with reading comprehension, writing, and math.  (SSA Rec. 216).  M.K's reading and writing ability was rated at grade level 4, and her ability in math was rated at grade level 3.5; her social and emotional behavior was assessed as age-appropriate.  (*Id.* at 216-17).

One year later, M.K.'s November 10, 2010 IEP stated that she was placed in general education classes with special education teacher support, which classes were to take place five times per week for the whole school year.  (SSA Rec. 311-12).  According to the IEP, M.K. was an attentive student who was "at her best in decoding," and she had developed basic writing skills.  (*See id.* at 313, 321).  The IEP indicated that M.K. needed to improve her math skills, including basic computations with multiple digits, decimals, and fractions.  (*Id.* at 313).  The IEP stated that M.K. was reading and writing at or above the sixth-grade level.  (*See id.*).  In math, however, the IEP rated M.K.'s ability in "problem solving" at a third-grade level and her ability in "computation" at a fourth-grade level.  (*Id.*).  As with previous assessments, M.K.'s class behavior and emotional behavior were described as appropriate.  (*Id.* at 314).  According to the IEP, M.K. did not require medication, treatment, or health-related services during the day, did not have mobility limitations, and was able to participate in all school activities.  (*Id.* at 315, 320).  The IEP further noted that M.K.'s adaptive behavior was within normal limits, and that she was cooperative and task-oriented, but that she needed some prompting and repetition and was vulnerable to forgetting what she had learned.  (*Id.* at 322).  The IEP assessed M.K. with "low average" cognitive functioning.  (*Id.*).

On November 12, 2010, one of M.K.'s teachers, Ms. Durant, completed a questionnaire that asked for an assessment of M.K.'s abilities at school.  (SSA Rec. 164-70).[12]  In "acquiring and using information," Ms. Durant assessed a "slight problem" in "comprehending oral instructions"; "understanding school and content vocabulary"; and "understanding and participating in class discussions."  (*Id.* at 165).  She assessed an "obvious problem" with "reading and comprehending written material"; "providing organized oral explanations and descriptions"; "expressing ideas in written form"; "learning new material"; and "recalling and applying previously learned material."  (*Id.*).  Ms. Durant also assessed a "very serious problem" with "comprehending and doing math problems"; and a "serious problem" with "applying problem-solving skills in class discussions."  (*Id.*).

In the area of attending and completing tasks, Ms. Durant found that M.K. had no problems with "paying attention when spoken to"; "refocusing on a task when necessary"; "waiting to take turns"; "changing from one activity to another without being disruptive"; and "organizing [her] own things or school materials."  (SSA Rec. 166).  She noted a "slight problem" with "focusing long enough to finish assigned activit[ies] or task[s]"; "carrying out single-step instructions"; "completing work accurately without careless mistakes"; "working without distracting [her]self or others"; "working at a reasonable pace/finishing on time"; and "using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation."  (*Id.* at 166-67).

---

[12]     The record does not indicate Ms. Durant's first name.

Ms. Durant assessed M.K. with an "obvious problem" with "carrying out multistep instructions"; and "completing class/homework assignments." (*Id.* at 166).

In the area of M.K.'s social interaction, Ms. Durant assessed "no problem" with playing cooperatively, expressing anger appropriately, asking permission, following rules, and respecting authority. (SSA Rec. 167). In the area of moving about and manipulating objects, Ms. Durant found "no problem" except for an "obvious problem" in remembering "controlled motor movements." (*Id.* at 168). Ms. Durant found "no problem" in M.K.'s ability to care for herself or in the area of health and physical well-being. (*Id.* at 169-70).

Finally, M.K.'s seventh-grade report card — the only report card that is contained in the record — shows that M.K. was receiving passing grades across the board during the first two marking periods of the year. (*See* SSA Rec. 281).

## C.   Social Security Administrative Proceedings

On September 21, 2010, Plaintiff "protectively filed" an application for SSI benefits with the Social Security Administration ("SSA") on behalf of her minor daughter, M.K. (SSA Rec. 125-33, 146).[13] Plaintiff sought benefits as of February 1, 2009. (*See id.*).

By letter dated January 6, 2011, Plaintiff was informed that her application for SSI had been denied because it was determined that M.K. was

---

[13]   The SSA will "use the date of an oral inquiry about SSI benefits as the filing date of an application for benefits" under certain circumstances. 20 C.F.R. § 416.345. Plaintiff and M.K. visited a SSA field office for an interview on September 21, 2010, inquired about M.K.'s eligibility for SSI benefits, and otherwise satisfied the requirements of 20 C.F.R. § 416.345. (*See* SSA Rec. 146-48). Accordingly, even though Plaintiff's formal application was filed on October 19, 2010 (*id.* at 125), Plaintiff's SSI benefits application received a "protective" filing date of September 21, 2010 (*id.* at 146).

not disabled.  (SSA Rec. 72).  In the denial letter, the SSA notified Plaintiff that she had the right to request a hearing before an Administrative Law Judge ("ALJ") if she disagreed with the decision.  (*Id.* at 73).  On March 4, 2011, Plaintiff requested a hearing, which was scheduled for October 11, 2011.  (*Id.* at 76-78, 86).  Plaintiff failed to appear for the hearing, but subsequently wrote to the SSA and demonstrated good cause for her absence.  (*See id.* at 86, 103).

The hearing was rescheduled for January 4, 2012.  (SSA Rec. 111).  On the date of the hearing, Plaintiff requested an adjournment so that she could search for counsel to represent her at the hearing.  (*Id.* at 56, 114).  The hearing was postponed until March 14, 2012, with the understanding that Plaintiff would proceed without counsel if she could not obtain representation by that date.  (*Id.* at 114-16).  Plaintiff was unable to obtain representation, and the hearing was held on March 14, 2012.  (*Id.* at 52-56).

ALJ Kenneth L. Scheer conducted the hearing, at which M.K. and Plaintiff testified.  (SSA Rec. 53).  First, the ALJ asked M.K. a series of questions relating to her physical symptoms, her social life, and her school work.  (*Id.* at 59-62).  M.K. testified that she walked to school — which was "across the street" — every day.  (*Id.* at 59).  She testified that she experienced pain in her neck and left shoulder resulting from the 2008 car accident, and that she did not attend gym regularly because of this pain.  (*See id.* at 60 ("[W]e have gym but I don't go as much … [b]ecause [of] my pain that I have.")).  She further testified that she had frequent headaches, and took Tylenol or Benadryl when she experienced these symptoms.  (*Id.* at 61).  M.K. testified that when

13

she came home from school, she liked "[t]o relax and do my homework."  (*Id.* at 59).  She added that she had access to a computer at home, and that she had approximately 80 friends on Facebook.  (*Id.* at 60).  Finally, when asked, M.K. testified that she aspired to become a veterinarian one day.  (*Id.* at 61).

Next, outside the presence of M.K., the ALJ asked Plaintiff — M.K.'s mother — a series of similar questions about her daughter.  (SSA Rec. 62). Plaintiff testified that her daughter was capable of attending to her own personal needs, such as dressing herself and using the bathroom.  (*Id.* at 64). Plaintiff testified that her daughter has experienced significant pain in her neck and left shoulder since the 2008 car accident, and that she has headaches on a daily basis.  (*Id.*).  Plaintiff further testified that her daughter was talking Naproxen and Tylenol to manage her pain, and that M.K. had attended physical therapy sessions since 2008.  (*Id.* at 64-65).  With respect to her education, Plaintiff testified that M.K. had repeated the third grade, and had been in "special classes" since the fourth grade because of her "learning disability."  (*Id.* at 62-63).[14]  Finally, Plaintiff testified that her daughter's focus and interest in school had waned since (and, in Plaintiff's estimation, because of) the 2008 car accident.  (*See id.* at 67 ("[S]he already was having difficulties with learning but then it's like, since the car accident, double, you know what I

---

[14]     Elsewhere, the record indicates that M.K. repeated the *first* grade.  (*See* SSA Rec. 225 ("[M.K.] attended Kindergarten and first grade in Philadelphia; however she was retained due to lack of progress in the first grade.  When she began the second grade she seemed to have caught up and was doing better academically.")).  Additionally, M.K.'s 2012 IEP makes no mention of M.K. repeating the third grade.  (*See id.* at 321 ("In English Language Arts (ELA), proficiency improved from marginal/basic in third grade to good in fourth; then back to marginal/basic in fifth grade last year.")).

mean.  She's had — she don't have, like she's not focusing.  She has lack of interest.  She don't want to do nothing.  She's lazy.  It's just a lot.")).

On April 20, 2012, the ALJ issued his decision denying Plaintiff's application for SSI (the "April 20 Decision") on the basis that M.K. "has not been disabled, as defined in the Social Security Act, since September 21, 2010, the date the application was filed."  (SSA Rec. 33).  On June 12, 2012, the Plaintiff — who had secured counsel for this stage of the process — requested a review of the April 20 Decision by the SSA Appeals Council.  (*Id.* at 14-17).  Plaintiff also requested additional time to supplement the medical record and submit legal argument (*id.* at 15) — a request that the SSA granted on September 21, 2012 (*id.* at 8).

On October 9, 2012, Plaintiff submitted a letter brief, arguing that the ALJ's April 20 Decision should be reversed because of four legal errors.  (*See* SSA Rec. 5, 195-96).  Specifically, Plaintiff argued that the ALJ failed to consider: (i) "a treating source [who] confirmed that [M.K.'s] chronic pain has not responded to treatment"; (ii) "the effect of [M.K.'s] headaches"; (iii) M.K.'s "fatigue"; and (iv) a "teacher's evaluation … indicating that the claimant has a 'serious problem' … in applying problem-solving skills in class discussions and a 'very serious problem' … in comprehending and doing math problems."  (*Id.* at 195-96).

On or about November 5, 2012, Plaintiff supplemented the record with an annotated, checklist-style medical report from Dr. Warman.  (*See* SSA Rec. 5, 406-08).  Dr. Warman indicated that she had known M.K. since October

15

15, 2010, and diagnosed M.K. with cervical radiculopathy.  (*Id.* at 406).  She also noted that M.K. suffered from "stiffness," "headaches," and "malaise." (*Id.*).  Dr. Warman assessed chronic neck pain that caused a "serious" problem with M.K.'s mobility (*id.* at 407), and a "very serious" problem with her health and well-being (*id.* at 408).  Dr. Warman also stated that M.K. had chronic headaches and depression.  (*Id.*).

On June 26, 2013, the Appeals Council denied Plaintiff's request for review because it "found no reason under [its] rules to review the [ALJ's] decision."  (SSA Rec. 1).  The Appeals Council informed Plaintiff that it had received and considered the supplemental legal argument and medical report submitted in support of Plaintiff's request for a review of the ALJ's April 20 Decision.  (*Id.* at 5).  Further, the Appeals Council informed Plaintiff that because it denied her request for review, the April 20 Decision constituted the final decision of the Commissioner of Social Security in her case, and that if she disagreed with the decision, she had the right to ask for court review by filing a civil action.  (*Id.* at 1-2).

### D.  The Instant Litigation

Plaintiff filed her *pro se* Complaint on July 17, 2013, seeking review of the April 20 Decision.  (Dkt. #2).  By Order dated August 1, 2013, this Court informed Plaintiff that her Complaint failed to indicate her relationship with M.K., such that she could file suit on M.K.'s behalf, and also failed to indicate

16

whether she resided within the Southern District of New York.  (Dkt. #7).[15]  The Court granted Plaintiff leave to amend her Complaint to cure these deficiencies (*id.*), which Plaintiff did on September 23, 2013 (Dkt. #8).

On September 24, 2013, the Court issued a Scheduling Order, which included deadlines for: (i) the filing of Defendant's notice of appearance; (ii) the filing and service of Defendant's Answer and the Electronic Certified Administrative Record ("e-CAR"); and (iii) the filing and service of motion papers in connection with the Defendant's motion for judgment on the pleadings. (Dkt. #9).  Defendant sought and received two extensions.  On January 1, 2014, the Defendant requested an extension of time to file its Answer, which the Court granted on the same day (Dkt. #14); and, on March 5, 2014, the Defendant requested an extension of time to file its motion for judgment on the pleadings, which the Court also granted on the same day (Dkt. #16). Defendant attempted to contact Plaintiff in order to obtain her consent to these extensions, but was unable to reach her on either occasion.  (*See* Dkt. #15, 16). On March 10, 2014, the Defendant filed its Answer and the e-CAR.  (Dkt. #17, 18).

Shortly thereafter, on April 21, 2014, Defendant filed its motion for judgment on the pleadings.  (Dkt. #19).  To date, Plaintiff has failed to file any opposition.  On July 9, 2014, Plaintiff filed a motion seeking the application of pro bono counsel.  (Dkt. #21).  By Order dated July 14, 2014, the Court

---

[15]   Plaintiff listed a "Brooklyn, NY" address in her Complaint.  (Dkt. #2).  However, this appears to have been a typographical error.  The record conclusively demonstrates that Plaintiff resides in the Bronx.  (*See, e.g.*, SSA Rec. 125, 160, 172, 197).

informed Plaintiff that Defendant's judgment on the pleadings had been pending and unopposed for nearly three months and denied her motion without prejudice to re-filing at a later date.  (Dkt. #22).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions Under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 548 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiffs'] claims

18

across the line from conceivable to plausible." (internal quotation marks omitted)).

Even where such a motion stands unopposed, as it does here, "the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law." *Vt. Teddy Bear Co.* v. *1-800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (internal quotation marks omitted) (applying this standard in the context of summary judgment); *see also Wellington* v. *Astrue*, No. 12 Civ. 3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013); *Martell* v. *Astrue*, No. 09 Civ. 1701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010).  When a plaintiff proceeds *pro se*, as Plaintiff does in this case, the Court is "obligated to construe [her] complaint liberally." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

### 2.   Review of Determinations by the Commissioner of Social Security

 In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "[A]n ALJ's credibility determination is generally entitled to deference on appeal." *Selian* v. *Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision

of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (citing *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))); *see also id.* ("If there is substantial evidence to support the determination, it must be upheld.").  More than that, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive." *Diaz* v. *Shalala,* 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (internal quotation marks omitted).  The substantial evidence standard is "a very deferential standard of review — even more so than the 'clearly erroneous' standard." *Brault* v. *Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2010).  In order to make this determination — whether the agency's finding were supported by substantial evidence — "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

### 3.  Qualifying for SSI Benefits as a Child

In order to qualify for SSI benefits under the Act, a claimant who is a child must demonstrate "[i] a medically determinable physical or mental

impairment, [ii] which results in marked and severe functional limitations, and [iii] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906; *see also Frye ex rel. A.O.* v. *Astrue,* 485 F. App'x 484, 486 (2d Cir. 2012) (summary order).  The Commissioner's regulations establish a three-step process for evaluating whether a child is disabled under the Act.  *See Encarnacion ex rel. George* v. *Astrue*, 568 F.3d 72, 75 (2d Cir. 2009).  First, the child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(a), (b).  Second, the child "must have a medically determinable impairment" that is "severe" in that it causes "more than minimal functional limitations."  *Id.* § 416.924(c).  Third, the child's impairment or combination of impairments must meet, medically equal, or functionally equal an impairment found in the Listings.  *See id.* § 416.924(d); 20 C.F.R. Part 404, Subpart P, Appendix 1.

For a child's impairment to functionally equal an impairment found in the Listings, the impairment must "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."  20 C.F.R. § 416.926a(a).  The "domains" that the regulations establish to determine whether impairments result in marked or extreme limitations are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being.  *Id.* § 416.926a(b)(1).

For purposes of this evaluation, a "marked" limitation is "'more than moderate' but 'less than extreme'" and "interferes seriously with" a child's "ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is "'more than marked'" and "interferes very seriously with" a child's "ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(3).  Because "an impairment or combination of impairments may have effects in more than one domain ... the SSA evaluates a child's impairments in any domain in which they cause limitations."  *Encarnacion*, 568 F.3d at 75-76 (citing 20 C.F.R. § 416.926a(c)).

**B.    Analysis**

Applying the appropriate standards, there is no basis to overturn the Commissioner's decision.  The record confirms that the ALJ's decision was based on the correct legal standard and supported by substantial evidence.

As an initial matter, the ALJ correctly noted that M.K. was under the age of 18 at the time she applied for SSI benefits and was therefore required to meet the requirements of 20 C.F.R. § 416.924(a) in establishing her entitlement to disability benefits under the Act.  (SSA Rec. 21).  *See also Williams* v. *Comm'n of Soc. Sec.*, No. 13 Civ. 5326 (VB), 2014 WL 4979494, at *10 (S.D.N.Y. Oct. 3, 2014).  In accordance with these regulations, the ALJ engaged in the requisite three-step analysis to determine whether M.K. was disabled.  (SSA Rec. 21-24).

At step one, the ALJ explained that M.K. had not been engaged in substantial gainful activity since her application date.  (SSA Rec. 24).  This

finding is wholly supported by evidence in the record that indicates M.K. attended school full-time.  (*See, e.g.*, *id.* at 140).  Accordingly, the ALJ correctly proceeded to step two.

At step two, the ALJ determined that M.K. had "severe" impairments. Specifically, the ALJ identified as severe impairments M.K.'s "learning disability" and her "neck and shoulder pain."  (SSA Rec. 24).  Again, this determination is supported by substantial evidence in the record.  Specifically, the record shows that M.K. attended special education classes in addition to her general education classes, and had frequent medical appointments and physical therapy sessions to treat her neck and shoulder pain.  (*Id.* at 62, 262-63, 311, 332-36, 340-41, 354-56).  Having determined that M.K. satisfied the step two requirement, the ALJ correctly proceeded to step three.

At step three of the analysis, the ALJ first concluded that M.K.'s impairments did not "meet[] or medically equal[] the severity of one of listed impairments."  (SSA Rec. 24).  The ALJ's determination is supported by substantial evidence in the record.  Taking M.K.'s learning disability first, the Court agrees with Defendant that the impairment found in § 112.05 of the Listings — "intellectual disability" — most closely matches M.K.'s impairment. (Def. Br. 16 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 § 112.05)).[16]  The evidence — particularly M.K.'s IQ score of 84 and the assessment from the

---

[16]   The Court notes that the Listings were amended in 2013 to replace the term "mental retardation" with "intellectual disability."  *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,501 (Aug. 1, 2013) ("[W]e believe it incumbent upon us to make this change in order to ensure that our listings and other rules reflect current terminology.").  The amendment made no substantive changes to § 112.05.

school psychologist, Dr. Bendele — demonstrates that M.K.'s learning disability does not approach the severity of "intellectual disability."  With respect to M.K.'s neck and shoulder pain, the Court agrees with Defendant that the impairments found in the Listings that most closely resemble M.K.'s physical impairment are found among the "musculoskeletal" impairments.  (Def. Br. 16-17 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 § 101)).  As there is no evidence in the record that M.K. was unable to walk for a sustained basis or perform fine and gross movements on a sustained basis, her impairments do not meet or medically equal the severity of "musculoskeletal" impairments in the Listings.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 101.00(B)(2)(a), 101.02.

Having found that M.K.'s impairments did not meet or medically equal any of the impairments in the Listings, the ALJ properly considered whether M.K.'s impairments nonetheless "functionally equal[ed] the severity of the [L]istings."  (SSA Rec. 24).  At this stage of the analysis, the ALJ considered the six "domains" of functioning required by 20 C.F.R. § 416.926a.  The ALJ's findings with respect to each of these six domains is supported by substantial evidence in the record.

First, the ALJ found that M.K. had a "less than marked limitation in acquiring and using information."  (SSA Rec. 28).  Significantly, Dr. Randall, the consulting pediatrician, and Ms. Tomcho, the speech and language pathologist, assessed a less than marked limitation in acquiring and using information.  (*Id.* at 270).  The opinions of these "non-treating" sources

constitute substantial evidence if they are supported by the record. *See Halloran* v. *Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Here, these opinions are supported by the record because M.K.'s intelligence testing indicated that her cognitive functioning was at least low average to average, and the school psychologist, Dr. Bandele, assessed only "a very mild learning disability." (SSA Rec. 226). *See also Dyer ex rel. K.O.* v. *Astrue*, No. 06 Civ. 6464 (MAT), 2008 WL 3200218, at *2 (W.D.N.Y. Aug. 5, 2008) (finding substantial evidence supported the ALJ's finding of a "less than marked limitation" in this domain where the claimant had average grades and a full scale IQ of 81).[17]

Next, with respect to "attending and completing tasks," the ALJ found that M.K. had no limitations. (SSA Rec. 29). This finding is supported by substantial evidence. M.K. was described as an "attentive student." (*Id.* at 313). Her teacher, Ms. Durant, noted no problems in M.K.'s ability to pay attention when spoken to, refocus on a task, wait to take turns, change activities, and organize things, and only a slight problem with focusing long enough to complete tasks, carrying out single-step instructions, completing

---

[17]   Although Plaintiff did not submit an opposition brief in the instant action, she did submit a letter brief when she appealed the ALJ's decision to the Appeals Council. (SSA Rec. 195-96). The Court has considered the arguments Plaintiff raised before the Appeals Council, one of which concerned M.K.'s limitations in the domain of "acquiring and using information." (*Id.* at 196). Specifically, Plaintiff argued that the ALJ had failed to consider Ms. Durant's questionnaire, which indicated that M.K. had a "serious problem" in "applying problem-solving skills in class discussions" and a "very serious problem" in "comprehending and doing math problems." (SSA Rec. 165). In his April 20 Decision, the ALJ considered M.K.'s ability to complete math problems and her ability to apply problem-solving skills in class discussions (*id.* at 25-26, 28), but mentioned only the detailed narratives regarding M.K.'s performance at school provided in the IEP and Dr. Bandele's evaluation — not the check-list style report prepared by Ms. Durant, which was accompanied by scant elaboration. "When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur*, 722 F.2d at 1040.

work without careless mistakes, working without distracting herself or others, and working at a reasonable pace. (*Id.* at 166). Additionally, the state agency consultants assessed no limitation in this domain. (*Id.* at 270).

The ALJ similarly concluded that M.K. had no limitation in the domain of "interacting and relating with others." (SSA Rec. 29-30). This domain considers how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). The record supports the ALJ's conclusion. M.K. testified that she maintained a Facebook page with 80 friends (SSA Rec. 60), and reported to one of her physicians that she enjoyed playing with her sibling and friends (*id.* at 263). Ms. Durant assessed no problems for M.K. in playing cooperatively, expressing anger appropriately, asking permission, following rules, or respecting authority. (*Id.* at 167).

Next, with respect to "moving about and manipulating objects," the ALJ found that M.K. had a limitation, but a less than marked one. (SSA Rec. 30-31). This domain considers how a child moves her body from one place to another and how she moves and manipulates objects. *See* 20 C.F.R. § 416.926a(j). Again, substantial evidence in the record supports the ALJ's finding.

As an initial matter, the Court notes that the only piece of evidence that indicates M.K. had marked or extreme difficulty moving about is the opinion of Dr. Warman. (*See* SSA Rec. 407). This piece of evidence was submitted to the

26

Appeals Council after the ALJ made his decision.  (*Id.* at 5).  Nonetheless, had

the ALJ considered this report, his finding would have remained unchanged

because Dr. Warman's opinions are flatly contradicted by other evidence in the

record.  *See Halloran*, 362 F.3d at 32 ("Although the treating physician rule

generally requires deference to the medical opinion of a claimant's treating

physician, the opinion of the treating physician is not afforded controlling

weight where, as here, the treating physician issued opinions that are not

consistent with other substantial evidence in the record, such as the opinions

of other medical experts." (internal citation omitted)).  In Dr. Warman's opinion,

M.K.'s neck and shoulder pain seriously affected her ability to walk, stand, and

run; balance; and otherwise move about in an appropriate manner.  (*Id.* at

407).  This opinion is contradicted by the report of a treating physician and the

report of a consulting physician.  (*See id.* at 265-66, 301, 401).  Dr. Farooqi —

 a treating physician — opined that M.K. had no physical restrictions and could

participate fully in gym.  (*Id.* at 303, 401).  Dr. DePaola — a consulting

physician — concluded that M.K. may have some limitations on physical

activity because of her pain, but noted only that she might need to rest for a

few seconds when participating in gym class.  (*Id.* at 266).  Dr. DePaola's

clinical findings support this opinion.  For example, Dr. DePaola indicated M.K.

had a normal and age-appropriate appearance; normal muscle tone and no

spasticity; normal range of motion in her back and extremities; full motor

strength in the upper and lower extremities, despite pain with left elbow

flexion; a normal spine; and physiologic and symmetrical reflexes in the upper

and lower extremities.  (*Id.* at 262-66).  In sum, substantial evidence contradicted Dr. Warman's opinion and supported the ALJ's finding of a less than marked limitation on this domain.  *See, e.g., Mongeur*, 722 F.2d at 1039 (finding that report of a consultative physician, along with other evidence in the record, provided sufficient evidence to contradict the opinion of a treating physician).

With respect to the fifth domain, "caring for yourself," the ALJ found no limitations.  (SSA Rec. 31-32).  This finding is also supported by substantial evidence.  M.K testified that she walked by herself to school (*id.* at 59), and Plaintiff reported that M.K. could take care of her hygiene, wash and put away clothes, help around the house, get to school on time, study and do homework, accept criticism, keep out of trouble, obey rules, avoid accidents, and ask for help when needed (*id.* at 143, 158).  Ms. Durant similarly found no problems in M.K.'s ability to care for herself (*id.* at 169), and M.K.'s November 2010 IEP stated that her adaptive behavior was within normal limits (*id.* at 322).

In considering the sixth and final domain, M.K.'s "health and physical well-being," the ALJ found a "less than marked" limitation.  (SSA Rec. 33).  A child may have a "marked" limitation in this domain if she is frequently ill or has frequent exacerbations resulting in significant, documented symptoms or signs.  20 C.F.R. § 416.926a(e)(2)(iv).  Although M.K. has complained of headaches since the 2008 car accident, she indicated that these were relieved with Tylenol.  (*Id.* at 61, 193, 295).  Furthermore, although M.K. reported chronic pain in her neck and shoulder, there is no indication that these

28

ailments caused hospitalizations or absences from school. (*See id.* at 282).
*See also Negron ex rel. M.C.N.* v. *Comm'r of Soc. Sec.*, No. 11 Civ. 8685 (KBF),
2013 WL 2896845, at *7 (S.D.N.Y. June 12, 2013) (finding substantial evidence
supported ALJ's finding of "less than marked" limitations in this domain where
claimant's chronic symptoms were managed by medication and there was no
record of hospitalizations); *cf. Hairston ex rel. S.N.* v. *Comm'r of Soc. Sec.*, No. 13
Civ. 3325 (FM), 2014 WL 5139293, at *16 (S.D.N.Y. Oct. 14, 2014) (remanding
for further administrative proceedings where the ALJ "furnished no explanation
why [the claimant's] allegedly frequent absences from school due to migraine
headaches did not give rise to a marked limitation in this domain").[18]

Having reviewed the entire record, the Court finds that the
Commissioner's decision to deny SSI benefits is free from legal error and
supported by substantial evidence in the record. Accordingly, there is no
reason for it to be overturned.

---

[18]    Several of the arguments raised before the Appeals Council concerned M.K.'s limitations
in the domain of "health and physical well-being." (SSA Rec. 195-96). Specifically,
Plaintiff argued that the ALJ failed to consider M.K.'s headaches, her fatigue and that
her "chronic pain has not responded to treatment" in evaluating her limitations in this
domain. (*Id.*). The Court has considered these arguments and finds them
unpersuasive. First, the ALJ expressly considered M.K.'s headaches during his analysis
of M.K.'s health and physical well-being. (*Id.* at 33 ("The claimant testified that she gets
frequent headaches since the 2008 accident.")). Next, there is simply no evidence in the
record to support the conclusion that M.K.'s "fatigue" created a marked limitation in her
health and physical well-being. While Plaintiff testified that her daughter "moves slower
than usual because [of] f[a]tigue [and] tiredness" (*id.* at 158), there is a dearth of other
evidence in the record to corroborate this assertion, and there is no evidence in the
record to establish the severity of this alleged impairment. Finally, with respect to the
success of M.K.'s treatment, Plaintiff cites a February 25, 2009 report from Dr. Li that
indicates M.K.'s "neck pain is not … responding [well] to conservative treatment." (*Id.* at
395). The record shows that the ALJ took Dr. Li's assessment into account when
making his findings, but concluded based on the entirety of the record — which
included subsequent "well visits" to Montefiore — that M.K. "is essentially in good
health." (*Id.* at 26). While the Court does not necessarily agree with this somewhat glib
characterization, it nonetheless finds substantial evidence in the record that supports
the ALJ's finding of a "less than marked" limitation in this domain.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is directed to terminate Docket Entry 19, and to mark the case closed.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:      December 17, 2014
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

A copy of this Order was mailed by Chambers to:

Maryam Tillman
1524 Purdy Street
Apt. 2
Bronx, NY 10462